Nos. 03-41049-ag (L)
Zuluaga Martinez v. INS

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————

August Term, 2006

(Argued: April 18, 2007                    Decided: April 23, 2008)

Docket Nos. 03-41049-ag (L), 05-3319-ag (CON)

———————

LEONARDO ZULUAGA MARTINEZ,

Petitioner,

—v.—

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

———————

Before:

WALKER, STRAUB, and B.D. PARKER,

Circuit Judges.

———————

Petitioner, a legal permanent resident alien, seeks review of a decision of the Board of

Immigration Appeals affirming the immigration judge's denial of cancellation of removal for

failure to satisfy the seven-year continuous residence requirement of the now-repealed INA §

212(c), 8 U.S.C. § 1182(c) (repealed 1996).  Because petitioner's removal proceedings were

initiated after the effective date of the Illegal Immigration Reform and Immigration

Responsibility Act of 1996 ("IIRIRA"), the agency retroactively applied IIRIRA's permanent

provisions, including the "criminal-offense stop-time rule," 8 U.S.C. § 1229b(d)(1)(B).  The

agency determined that pursuant to this rule, petitioner's commission of a criminal offense on April 9, 1995 terminated his period of continuous residence one month before he could achieve the requisite seven years.

We hold that § 1229b(d)(1)(B) as applied to petitioner is not impermissibly retroactive and deny the petition.

Judge STRAUB concurs in a separate opinion.

_____

LEONARDO ZULUAGA MARTINEZ, pro se, Framingham, Mass., for Petitioner.

LIZAS MURCIA, Assistant United States Attorney (Terrance P. Flynn, United States Attorney for the Western District of New York, on the brief), Buffalo, N.Y., for Respondent.

NANCY MORAWETZ, Washington Square Legal Services, New York University School of Law, New York, N.Y., Amicus Curiae in Support of Petitioner.

_____

John M. Walker, Jr., Circuit Judge:

Petitioner, a legal permanent resident alien, seeks review of a decision of the Board of Immigration Appeals affirming the immigration judge's denial of cancellation of removal for failure to satisfy the seven-year continuous residence requirement of the now-repealed INA § 212(c), 8 U.S.C. § 1182(c) (repealed 1996). Because petitioner's removal proceedings were initiated after the effective date of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), the agency retroactively applied IIRIRA's permanent provisions, including the "criminal-offense stop-time rule," 8 U.S.C. § 1229b(d)(1)(B). The agency determined that pursuant to this rule, petitioner's commission of a criminal offense on

April 9, 1995 terminated his period of continuous residence one month before he could achieve the requisite seven years. Petitioner asks us to review that determination.

**BACKGROUND**

Petitioner Leonardo Zuluaga Martinez ("Zuluaga"), a native and citizen of Colombia, entered the United States in April 1985. He became a legal permanent resident on December 1, 1990. On April 9, 1995, Zuluaga was arrested in Massachusetts for possession of heroin. This led to his conviction, in May 1998, based on a guilty plea to illegal possession of drugs and three counts of assault and battery, under Massachusetts law, for which he was sentenced to an 18 month term of imprisonment.

In June 1998, the Immigration and Naturalization Service ("INS") served Zuluaga with a notice to appear, charging him as removable under Immigration and Nationality Act ("INA") § 237(a)(2)(B)(i), for having "been convicted of a violation of . . . any law or regulation of a State . . . relating to a controlled substance." 8 U.S.C. § 1227(a)(2)(B)(i). In March 1999, petitioner was convicted a second time for illegal possession of heroin in violation of Massachusetts law, following an arrest on November 21, 1997. The INS thereupon charged Zuluaga as being additionally removable as an aggravated felon pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), based on the May 1998 convictions for assault and battery, and pursuant to INA § 237(a)(2)(B)(i), based on the March 1999 heroin conviction.

In May 1999, at a hearing before the Immigration Judge ("IJ"), Zuluaga admitted to all of the above convictions. The IJ then found (1) that Zuluaga was removable from the United States and (2) that the assault and battery offenses were aggravated felonies; the latter making Zuluaga

statutorily ineligible for cancellation of removal under INA § 240A(a). See 8 U.S.C. § 1229b(a)(3). The IJ ordered Zuluaga removed to Colombia.

Zuluaga appealed to the Board of Immigration Appeals ("BIA"). In October 1999, while that appeal was pending, the Massachusetts state court granted Zuluaga's motion to vacate his assault and battery convictions because the trial court had failed to warn him about the immigration consequences of the plea. The BIA initially dismissed Zuluaga's appeal, but subsequently granted his motion to reopen based on Massachusetts's vacatur to allow Zuluaga to pursue cancellation of removal.

The IJ, on remand, then determined what lies at the heart of this appeal: that Zuluaga was still statutorily ineligible for cancellation of removal because he had failed to achieve seven years of continuous lawful permanent residence, as required under INA § 240A(a)(2), 8 U.S.C. § 1229b(a)(2). The IJ found that because Zuluaga had entered the country illegally without inspection, his period of lawful residence did not begin until May 4, 1988, the date he applied for temporary resident status. The IJ further determined that by operation of the stop-time rule of INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1)(B), which became effective according to IIRIRA on April 1, 1997, Zuluaga's period of continuous residence ended on April 9, 1995 when he committed his first drug offense, a month short of the seven years of continuous lawful permanent residence necessary for cancellation eligibility. The IJ denied Zuluaga's application for cancellation of removal and the BIA summarily affirmed.

The district court, upon a habeas petition, returned the case to the IJ, via the BIA, to determine whether Zuluaga might have been admitted earlier than May 4, 1988. But, after

considering further evidence on the issue, the IJ confirmed his original determination, again denied relief, and ordered removal.

Zuluaga then moved for reconsideration of the IJ's decision, not arguing that the May 4, 1998 starting date for the seven year period was improper, but that the application of the stop-time rule which cut off the period just short of the seven years was impermissibly retroactive. The IJ declined reconsideration, relying on the BIA's decision in In re Perez, 22 I. & N. Dec. 689 (B.I.A. 1999) (en banc), which had applied the stop-time rule to offenses preceding the passage of IIRIRA.

In November 2003, the BIA rejected Zuluaga's appeal. The BIA affirmed the IJ's conclusion that Zuluaga had failed to demonstrate the requisite seven years of continuous residence prior to the commission of his crime on April 9, 1995. Relying also on In re Perez, the BIA concluded that the stop-time rule applied to Zuluaga's situation and precluded cancellation of removal. Zuluaga timely filed a petition for review of the BIA's decision.

**DISCUSSION**

Zuluaga does not challenge the agency's factual determination that his continuous residence "clock" began to run on May 4, 1988, but he argues that it did not stop on April 9, 1995. Zuluaga maintains that the criminal-offense stop-time rule, which became effective on April 1, 1997, is impermissibly retroactive as applied to criminal conduct that preceded its enactment. Zuluaga asks us to conclude (1) that the commission of the offense on April 9, 1995 did not stop the accrual of his seven years of permanent residence and (2) that he is therefore eligible for cancellation of removal. As a consequence, he asks us to remand to the BIA for

further remand to the IJ for a determination as to whether a favorable exercise of discretion is warranted.

### A. Immigration Framework in 1995

Under the immigration laws in effect in April 1995, when Zuluaga committed the offense at issue, legal permanent residents who were subject to deportation, but who had resided in the United States for seven consecutive years, were eligible to apply for a discretionary waiver of deportation under INA § 212(c). See 8 U.S.C. § 1182(c) (repealed 1996) ("Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General . . . ."). Although "§ 212(c) was literally applicable only to exclusion proceedings," the BIA interpreted the provision "to authorize any permanent resident alien with 'a lawful unrelinquished domicile of seven consecutive years' to apply for a discretionary waiver from deportation." INS v. St. Cyr, 533 U.S. 289, 295 (2001) (citing In re Silva, 16 I. & N. Dec. 26, 30 (B.I.A. 1976) (adopting position of Francis v. INS, 532 F.2d 268 (2d Cir. 1976))).

"The decision of whether to award section 212(c) relief involved only a balancing of the 'adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of [a section 212(c) waiver] appear[ed] in the best interests of this country.'" Kai Tung Chan v. Gantner, 464 F.3d 289, 295 (2d Cir. 2006) (per curiam) (quoting In re Marin, 16 I. & N. Dec. 581, 584 (B.I.A. 1978)) (alterations in original). Although the decision to grant § 212(c) relief was ultimately a

6

discretionary one, a "substantial percentage" of applications were granted.  St. Cyr, 533 U.S. at 296 (noting that between 1989 and 1995, over 10,000 applicants obtained § 212(c) relief).

Under the pre-IIRIRA system then in existence, aliens accrued time toward their required period of continuous residence and physical presence until they applied for relief from deportation.  See Arenas-Yepes v. Gonzales, 421 F.3d 111, 115 n.4 (2d Cir. 2005).  This gave aliens an incentive to delay their deportation proceedings until they could fulfill the requisite seven years.  See Suassuna v. INS, 342 F.3d 578, 581 (6th Cir. 2003).  Before IIRIRA, the accrual of time towards seven years of continuous residence was not stopped by the commission of a crime.

**B.     The Illegal Immigration Reform and Immigration Responsibility Act of 1996**

IIRIRA, which was enacted on September 30, 1996 and went into effect on April 1, 1997, eliminated the § 212(c) waiver, and replaced it with cancellation of removal, "a more strict procedure."  United States v. Johnson, 391 F.3d 67, 70 (2d Cir. 2004).  Under INA § 240A(a), which replaced INA § 212(c), a legal permanent resident alien must satisfy three conditions to qualify for cancellation of removal relief: the alien (1) must have been "lawfully admitted for permanent residence for not less than 5 years," (2) must have "resided in the United States continuously for 7 years after having been admitted in any status," and (3) must "not [have] been convicted of any aggravated felony."  8 U.S.C. § 1229b(a).  The only one of these conditions in dispute here is the continuous residency requirement of INA § 240A(a)(2).

**C.     Whether Application of 8 U.S.C. § 1229b(d)(1)(B) to Zuluaga's Case Raises Retroactivity Concerns At All**

In addition to instituting this new cancellation of removal scheme, however, IIRIRA

7

established a new stop-time rule in INA § 240A(d)(1) for calculating an alien's period of continuous residence or physical presence. It is this rule that the government says operates to cut off Zuluaga's continuous residence period and thereby destroys his eligibility for cancellation of removal.

The rule provides in relevant part that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien . . . removable from the United States." 8 U.S.C. § 1229b(d)(1)(B) (emphasis added). Thus, it is the date of the commission of the offense – not the date of the subsequent conviction – that matters for purposes of computing an alien's period of continuous residence. See Tablie v. Gonzales, 471 F.3d 60, 62 (2d Cir. 2006) ("Under subsection 240A(d)(1), called the 'stop-time rule,' the alien's continuous residency or physical presence ends, for purposes of cancellation of removal, on the date he commits a qualifying offense or on the date a notice to appear is filed." (emphasis added)). If the stop-time rule applies to Zuluaga's situation, he is ineligible for cancellation of removal. However, because § 1229b(d)(1)(B) did not exist at the time Zuluaga committed the offense, we must ascertain whether the stop-time rule is or is not impermissibly retroactive as applied to his case. See Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994) (reciting the general principle that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place" (quoting Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855

(1990) (Scalia, J., concurring)) (emphasis added)).[1]

### D. Retroactivity Analysis under Landgraf

In Landgraf, the seminal case on retroactivity, the Supreme Court confirmed the continuing viability of the centuries-old presumption against retroactive legislation, emphasizing that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." Id. at 265. At the same time, the Court acknowledged that Congress had the power, within constitutional limits, to enact laws with retroactive effect. It also observed that "[r]etroactivity provisions [in civil legislation] often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." Id. at 267-68.

Based on the above principles, the Landgraf Court articulated a two-step test for determining when a statute could be applied retroactively. In the first step, the court must ascertain, using the ordinary tools of statutory construction, "whether Congress has expressly

---

[1] The government argues that our holding in Domond v. INS, 244 F.3d 81 (2d Cir. 2001) requires a different result on this score. The government is incorrect. In Domond, we held that the aggravated felony bar of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 440(d), 110 Stat. 1214, 1227 (1996), was not retroactive as applied to an alien whose criminal conduct pre-dated AEDPA, but whose conviction came after AEDPA's enactment. 244 F.3d at 86. This was so because "[w]hile the underlying criminal conduct is crucial to the conviction, it is not the conduct that bars relief under the statutory scheme." Id. By contrast, under § 1229b(d)(1)(B), it is the underlying criminal act – not the conviction – that triggers disqualification from relief. In this case, the underlying criminal conduct took place on April 9, 1995. Because the triggering conduct here took place prior to the effective date of the act, Domond is inapposite.

9

prescribed the statute's proper reach." Id. at 280; see also Fernandez-Vargas v. Gonzales, __U.S.__, 126 S.Ct. 2422, 2428 (2006). If the answer is yes, the inquiry is over, and "there is no need to resort to judicial default rules." Landgraf, 511 U.S. at 280. If, however, "the statute contains no such express command," the court must move on to the second step and decide whether application of the statute would have a genuinely "retroactive effect." Id. This is not always a simple task, because "[a] statute [is not impermissibly retroactive] merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." Id. at 269 (citation omitted). Rather, the court must assess "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event," and determine "whether the new provision attaches new legal consequences to events completed before its enactment." Id. at 269-70. If so, then the traditional presumption against retroactivity pertains and the new statute must be construed "as inapplicable to the event or act in question owing to the 'absen[ce of] a clear indication from Congress that it intended such a result.'" Fernandez-Vargas, 126 S. Ct. at 2428 (quoting St. Cyr, 533 U.S. at 316) (alteration in original).

1.    **Landgraf Step One:  Whether Congress Has Expressly Commanded That §**
      **1229b(d)(1)(B) Be Applied to Pre-IIRIRA Conduct**

Our analysis as to whether Congress expressly proscribed that the statute apply retroactively begins with an examination of the text. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). And on this score both parties agree that nothing in the language of 8 U.S.C. § 1229b(d)(1), or any other provision of the INA, explicitly directs that the criminal-offense stop-

10

time rule be applied to pre-IIRIRA conduct. Significantly, Congress did include express statements in IIRIRA mandating the retroactive application of other provisions, such as the expanded definition of aggravated felony. See IIRIRA § 321(b), 110 Stat. at 3009-628 ("Notwithstanding any other provision of law (including any effective date), the term ["aggravated felony"] applies regardless of whether the conviction was entered before, on, or after [September 30, 1996]."); see also St. Cyr, 533 U.S. at 318-19. The absence of such an express statement with respect to § 1229b(d)(1)(B) indicates "that Congress did not definitively decide the issue of [the provision]'s retroactive application to pre-enactment [conduct]." St. Cyr, 533 U.S. at 320 (quotation marks omitted). We thus do not find that Congress has expressly prescribed the statute's reach.

Despite the absence of a clear textual command in § 1229b(d)(1)(B), the government argues that Congress plainly intended for the criminal-offense stop-time rule to apply retroactively. The government finds this intent in the transitional rule of IIRIRA § 309(c)(5). The government further contends that this Court's recent decision in Tablie, which interpreted IIRIRA § 309(c)(5), compels denial of Zuluaga's petition.

IIRIRA § 309(c)(5) and Tablie, however, are not dispositive of this case. Unlike Tablie, this case is a permanent rule case: Because the proceedings against Zuluaga were not pending when IIRIRA was enacted or when it went into effect, the transitional rules do not apply. See Arenas-Yepes, 421 F.3d at 115; see also 143 Cong. Rec. S12658-01, at S12660 (1997) ("Section 203 modifies certain transitional rules established by IIRIRA with regard to suspension of deportation and cancellation of removal. The changes state that the 'stop time' rule established

11

by that Act in section 240A of the INA shall apply generally to individuals in deportation proceedings before April 1, 1997, with certain exceptions.") (emphasis added). Thus the permanent provisions of IIRIRA govern Zuluaga's petition, see Kuhali v. Reno, 266 F.3d 93, 99 (2d Cir. 2001), and, as already discussed, nothing in those provisions clearly mandates the retroactive application of § 1229b(d)(1)(B) to pre-IIRIRA conduct.

The government next argues that even if the transitional rule does not technically govern this case, it would be "incongruous" to "hold that the stop-time rule does not apply to [Zuluaga], where this Court has held that it applied to Tablie." Government's Reply Brief at 13. To avoid this incongruity, the government asks us to treat Zuluaga's case as if it were a transitional-rule case and, in support, cites two cases from other circuits, Garcia-Ramirez v. Gonzales, 423 F.3d 935 (9th Cir. 2005) (per curiam), and Heaven v. Gonzales, 473 F.3d 167 (5th Cir. 2006).

We decline, however, to follow the path taken by the Fifth and Ninth[2] Circuits. Assuming that it would be "incongruous" for the stop-time rule to apply retroactively in transitional cases but not permanent-rule cases, that fact does not give us license to artificially stretch the transitional rules to cover this case. As one court correctly observed, "[s]ection 309(c)(5) shows . . . that when Congress wanted the [stop-time] provision to apply retroactively

---

[2] We note that the Ninth Circuit has declined to follow Garcia-Ramirez's approach in subsequent decisions. See Valencia-Alvarez v. Gonzales, 469 F.3d 1319, 1326-27, 1327 n.10 (9th Cir. 2006) (finding the language of IIRIRA insufficiently clear to infer an intent on the part of Congress to make § 1229b(d)(1)(B) retroactively applicable in permanent-rule cases); Sinotes-Cruz v. Gonzales, 468 F.3d 1190, 1199-201 (9th Cir. 2006) (concluding that the question of § 1229b(d)(1)(B)'s temporal reach could not be resolved at step one of Landgraf because the language of the permanent provision "is ambiguous with respect to its retroactivity," and the "transitional rule does not clearly indicate that it is to be applied retroactively to part B of § 1229b(d)(1) in all circumstances").

12

to a limited category of cases – deportation cases pending when IIRIRA took effect – it said so clearly." Henry v. Ashcroft, 175 F. Supp. 2d 688, 694 (S.D.N.Y. 2001). Congress could have done the same for permanent-rule cases, but did not. We will not infer from this silence congressional intent for § 1229b(d)(1)(B) to apply retroactively in this case.

Amicus counsel, on the other hand, argues that Congress intended the opposite: that § 1229b(d)(1)(B) not be applied to pre-IIRIRA conduct in permanent-rule cases because "the plain language of the IIRIRA addressing the applicability of different bars to relief shows that Congress used express language when it chose to limit relief based on past events," and because "a backward looking interpretation would produce absurd results." Amicus Brief of Nancy Morawitz at 13. To the extent that there is any ambiguity, amicus counsel asserts that the rule of lenity requires that the ambiguity be resolved in Zuluaga's favor. We disagree.

The absence of express language going to the temporal scope of a new statutory provision may indicate that Congress failed to specifically consider the issue. It does not, however, evince a clear intent to bar the application of a new provision to any case that somehow implicates past conduct or prior events. While there is a judicial presumption against retroactive application, that presumption operates only after the court determines, in step two of the Landgraf analysis, that the provision would have an impermissible retroactive effect as applied to the case at hand. In other words, silence or ambiguity in the statutory text and history requires the court to move on to step two, not to declare a victory for the opponent of retroactivity at step one. See St. Cyr, 533 U.S. at 320.

Amicus counsel's absurdity argument is flawed for the same reason. The critical inquiry

13

at step one of Landgraf is "whether Congress has expressly prescribed the statute's proper reach." Landgraf, 511 U.S. at 280. Based on the relevant text, we conclude that it has not. Therefore, to determine whether § 1229b(d)(1)(B) may be applied to Zuluaga's 1995 offense, we must proceed to step two of the Landgraf inquiry.

### 2.    Landgraf Step Two: Whether Application of § 1229b(d)(1)(B) to Zuluaga's Pre-IIRIRA Conduct Would Produce an Impermissible Retroactive Effect

Before addressing the merits of step two, we pause to consider the extent of deference, if any, that is owed to the BIA's decision in In re Perez, 22 I. & N. Dec. 689, in which the BIA held that the stop-time rule does not have an impermissible retroactive effect as applied to an alien whose criminal conduct occurred prior to IIRIRA's passage. 22 I. & N. Dec. at 691. In general, when Congress has delegated authority to an agency to administer a statute, and "the statute is silent or ambiguous with respect to [a] specific issue," we must accord substantial deference to a reasonable interpretation given by the agency and cannot "simply impose [our] own construction on the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). "The BIA, through powers delegated by the Attorney General, enforces and interprets the INA and thus has the authority to fill statutory gaps with reasonable interpretations." Blake, 498 F.3d at 100 (citing 8 U.S.C. § 1103(a)).

As we have determined, IIRIRA is silent with respect to the specific issue in this case – § 1229b(d)(1)(B) retroactivity. Though statutory silence would ordinarily trigger Chevron deference, this principle does not hold when the issue is retroactivity, for a statute that is silent

14

"with respect to retroactive application is construed under [the Supreme Court's] precedent to be unambiguously prospective" in effect. St. Cyr, 533 U.S. at 320 n.45. Accordingly, "there is, for Chevron purposes, no ambiguity in such a statute for an agency to resolve." Id.; see also Henderson v. INS, 157 F.3d 106, 130 (2d Cir. 1998) ("[U]nder ordinary rules of statutory construction, a statute that is silent with respect to retroactivity is not 'ambiguous.'"). What remains to be determined is whether the provision would have an improper retroactive effect in the particular case; that inquiry, however, does not concern the sort of statutory gap that Congress has designated the BIA to fill, nor a matter in which the BIA has particular expertise. Cf. Gill v. INS, 420 F.3d 82, 89 (2d Cir. 2005) ("Because the BIA has expertise applying and construing immigration law, we afford Chevron deference to its construction of undefined statutory terms . . . ."). We therefore decline to defer to the BIA's opinion in In re Perez and proceed to make our own determination under Landgraf's second step.

In Landgraf, the Supreme Court explained that a statute is impermissibly retroactive if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." 511 U.S. at 269 (quotation marks omitted). Each of the identified effects is "a sufficient, rather than a necessary, condition for invoking the presumption against retroactivity." Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 947 (1997) (emphasis in original). In applying this framework we must exercise our "commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." St. Cyr, 533 U.S. at 321 (quotation marks omitted). Our analysis is further

15

"informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." Id. (quotation marks omitted).

Exercising our "commonsense, functional judgment" leads us to conclude that § 1229b(d)(1)(B) would not have an impermissible retroactive effect if applied to Zuluaga's 1995 offense. As the Supreme Court has observed, whether "a particular application is retroactive will depen[d] upon what one considers to be the determinative event by which retroactivity or prospectivity is to be calculated." Republic Nat'l Bank of Miami v. United States, 506 U.S. 80, 100 (1992) (Thomas, J., concurring) (emphasis and alteration in original) (internal quotation marks and citation omitted). As discussed above, the determinative event here happened when Zuluaga committed the drug offense and not when he was convicted. See Landgraf, 511 U.S. at 265 ("[T]he legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." (internal quotation omitted)). And while we note that it is sometimes proper to find that the determinative event is a date subsequent to the underlying criminal act when there is "relevant secondary conduct," see St. Cyr v. INS, 229 F.3d 406, 418 (2d Cir. 2000) (emphasis added), there was no such secondary conduct here. After petitioner committed the offense, he did no more than passively await the outcome of his prosecution. Cf. id. (finding date of underlying criminal conduct to be an inappropriate trigger for retroactivity analysis when there was a later "decision to enter a guilty plea to [the] crime"(emphasis added)(internal quotation marks and citation omitted)).

Because the trigger for retroactivity analysis here is the date that Zuluaga committed the

16

drug offense, he cannot show that the new law attaches a new disability on past acts.[3]

Deportation is the consequence he receives upon retroactive application of the stop-time rule just as it is the consequence he would have received immediately following his criminal conduct. The instant petitioner committed the offense before meeting the seven-year residency requirement for suspension of deportation, he became eligible for deportation. See Immigration and Nationality Act ("INA") § 237(a)(2)(B)(I), 8 U.S.C. § 1227(a)(2)(B)(I) ("Any alien who at any time after admission has been convicted of a violation of . . . any law . . . relating to a controlled substance . . . other than a single offense involving [a small amount of marijuana for one's own use] is deportable."). That is, if petitioner had been captured and successfully prosecuted — by plea, adverse jury verdict, or otherwise — and the INS had obtained a deportation order promptly after he committed the offense, he could have been deported without the possibility of relief because he would not, at that time, have accrued the seven years required by the repealed INA § 212(c). It was only the time required to bring an offender to justice that pushed the disposition of his case beyond the seven-year threshold. But this lapse of time, in the absence of circumstances requiring additional retroactivity scrutiny, such as subsequent conduct in reliance on the then-existing state of the law or the creation of a vested right after the criminal act, does not create a material difference for retroactivity purposes between an alien in Zuluaga's

---

[3] Zuluaga does not appear to argue that his case falls within Justice Story's category of retroactivity pertaining to the cancellation of "vested rights." In any event, such an argument would be without merit because the Supreme Court has cautioned that "cancellation of removal . . . [and other] putative claims to relief are not 'vested rights,' a term that describes something more substantial than inchoate expectations and unrealized opportunities." Fernandez-Vargas v. Gonzales, 126 S. Ct. 2422, 2432 n.10 (2006).

situation and an alien who was successfully convicted and deported prior to accruing seven years of continuous residence.

Our view is supported by the facts of Landgraf itself. There, the Supreme Court considered the retroactivity of § 102 of the Civil Rights Act of 1991, which "significantly expand[ed] the monetary relief" available to plaintiffs who proved intentional employment discrimination under Title VII of the Civil Rights Act of 1964. Landgraf, 511 U.S. at 253. Prior to the 1991 Act, Title VII plaintiffs could only recover backpay; afterwards, as a result of § 102, plaintiffs who won a backpay award could recover compensatory and punitive damages as well. See id. at 253-54. The Court acknowledged that "concerns of unfair surprise and upsetting expectations [were] attenuated in the case of intentional employment discrimination, which ha[d] been unlawful for more than a generation" prior to the 1991 Act. Id. at 283 n.35. The Court nonetheless concluded that "the new compensatory damages provision would operate 'retrospectively' if it were applied to conduct occurring before [the enactment of the 1991 Act]," because it would place a new legal burden on past conduct:

> Unlike certain other forms of relief, compensatory damages are quintessentially backward looking. . . . In this case, the event to which the new damages provision relates is the discriminatory conduct of respondents' agent John Williams; if applied here, that provision would attach an important new legal burden to that conduct. The new damages remedy in § 102, we conclude, is the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent.

Landgraf, 511 U.S. at 282-83.

The relationship between the consequences of a new law and the conduct pre-dating the new law is an important one for retroactivity analysis. See Landgraf, 511 U.S. at 270 ("The

conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."). And what was present in Landgraf, but is absent here, is changed consequences. See id. at 283. The statute in Landgraf was impermissibly retroactive because it would allow the recovery of compensatory damages that were not recoverable under the law that existed when the conduct at issue occurred. In contrast, IIRIRA, as applied to petitioner here, did not change the consequence of petitioner's criminal act. Zuluaga's commission of the crime charged immediately placed him in a category of aliens eligible for deportation upon conviction.

Our decision remains sound when reasonable reliance is taken into consideration.[4] In

---

[4] The concurrence argues, in essence, that reliance is the only factor relevant to retroactivity analysis in immigration cases in this Circuit. That is, the concurrence argues that "in our Circuit, petitioners . . . must show that they detrimentally relied on the prior law." But we have never stated that petitioners must show reliance in every case. While it is clear that reliance has played an important role in our retroactivity cases in the immigration context, the fact that one factor may be determinative in certain cases does not mean that it is the only determinative factor in every case. Indeed, in Domond v. INS, 244 F.3d 81 (2d Cir. 2001), we undertook the same analysis as the majority opinion now takes. After stating that the question before the court was "whether the lack of discretionary relief applies to aliens whose criminal conduct pre-dates enactment of AEDPA," and after finding that the statute was ambiguous, we proceeded under Landgraf's second step to ascertain whether the statute "imposes 'new legal consequences to events completed before its enactment.'" Id. at 85 (internal citation omitted). We also said we would "rely on 'familiar considerations of fair notice, reasonable reliance, and settled expectations' for guidance in determining retroactive effect." Id. (internal citation omitted).

Under Landgraf's second step in Domond we then held "that Section 440(d) imposes no new legal consequences on aliens like Domond whose conduct pre-dates AEDPA, but whose convictions came after AEDPA's enactment." Id. (emphasis added). The panel in Domond reached this conclusion, as the majority opinion does, because "[d]eportation was always the consequence" of the petitioner's criminal conduct. Finally after engaging in the foregoing

19

many cases regarding impermissible retroactivity in the immigration context, the issue of reliance plays a central role in the court's analysis. In St. Cyr, the Supreme Court emphasized that St. Cyr, and many others in his situation, had pled guilty and waived their right to a trial in reliance on the continued availability of § 212(c) relief. See St. Cyr, 533 U.S. at 323 ("Relying upon settled practice, the advice of counsel, and perhaps even assurances in open court that the entry of the plea would not foreclose § 212(c) relief, a great number of defendants in [petitioners'] position agreed to plead guilty."). Following St. Cyr, this Court has likewise focused on the concept of detrimental reliance in analyzing the effect of IIRIRA's repeal of § 212(c) on aliens previously convicted of aggravated felonies. See Rankine v. Reno, 319 F.3d 93, 100 (2d Cir. 2003) (holding that the repeal of § 212(c) was not impermissibly retroactive as applied to aliens who were convicted following jury trial prior to the repeal, because they could not show that they "chose to go to trial in reliance on the availability of § 212(c) relief"). But see Restrepo v. McElroy, 369 F.3d 627, 634 (2d Cir. 2004) (clarifying that the repeal could have an improper retroactive effect as to an alien who, after losing at trial, "decid[ed] to forgo the immediate filing of a 212(c) application based on the considered and reasonable expectation that he would be permitted to file a stronger application for 212(c) relief at a later time"); see also Wilson v. Gonzales, 471 F.3d 111, 122 (2d Cir. 2006) (requiring that aliens who claim to have "delayed

reasoning we added: "[n]or does Domond's loss of the Section 212(c) hearings in these circumstances raise the same reliance and expectation concerns raised in St. Cyr." Id. (emphasis added). As the conjunction "nor" indicates, reliance was not even the first, much less the only factor the Court analyzed under Landgraf's second step. We therefore disagree with our colleague that reliance is the sole factor considered in our jurisprudence in immigration cases raising retroactivity concerns.

20

filing an affirmative § 212(c) application to build a stronger case warranting the granting of that relief" to make an individualized showing of reliance).

When, as in the above cases, the relevant conduct is a legal decision[5] – e.g., the decision to plead guilty or go to trial – it makes sense to focus on whether the alien detrimentally relied upon the then-existing law in making the decision. On the other hand, it makes no sense at all to ask whether an alien, in committing a drug trafficking offense, acted with "an intention to preserve [his or her] eligibility for relief under § 212(c)," Rankine, 319 F.3d at 100, or in an effort to "conform[] his or her conduct according to the availability of relief," St. Cyr, 229 F.3d at 420. Cf. St. Cyr, 229 F.3d at 418 (noting the absurdity of the notion that aliens committed drug crimes in reliance on the continued availability of discretionary relief). We therefore conclude that Zuluaga cannot show a protectable reliance interest here.

Moreover, even if Zuluaga were to have somehow improbably relied on the absence of the stop-time rule when he committed the offense, as explained above, the retroactive application of the stop-time rule did not alter the legal consequence of his actions. And there was no subsequent reliance because Zuluaga did not later enter into a transaction or engage in conduct in

---

[5]See St. Cyr v. INS, 229 F.3d 406, 418 (2d Cir. 2000) ("'[I]t is the conviction, not the underlying criminal act, that triggers the disqualification from § 212(c) relief.' Thus, in considering whether the changes to the availability of discretionary relief would alter the legal effect of conduct that predates the AEDPA and IIRIRA's enactment, our analysis focuses on the decision to enter a guilty plea to a crime – not on the criminal conduct – that qualifies the alien for removal under the immigration laws." (citation omitted)); see also id. at 419 ("[A] legal resident who is charged with a crime that renders him removable from the United States carefully considers the immigration consequences of his or her conviction and, specifically, the availability of discretionary relief from removal. It is not unreasonable to attribute knowledge of the availability of relief to a legal resident because it is a common requirement that defense counsel and the court advise a criminal defendant of the immigration consequences of a guilty plea.").

21

reliance on the availability of discretionary relief. See Rankine v. Reno, 319 F.3d 93, 100 (2d Cir. 2003) ("[P]etitioners neither did anything nor surrendered any rights that would give rise to a comparable reliance interest."). Petitioner did nothing except wait while the criminal justice process ran its course.

Additionally, taking into account "familiar considerations of fair notice . . . and settled expectations," INS v. St. Cyr, 533 U.S. 289, 321 (2001)(internal quotation marks and citation omitted), we fail to see how either of these guiding principles was contravened in the instant case. Fair notice was not violated because the law was certain at the time Zuluaga acted. He would have been deportable without possibility of discretionary relief had he been convicted before he accrued seven years. See 8 U.S.C. § 1227(a)(2)(B)(i). And settled expectations were not disrupted because, assuming that Zuluaga expected anything with respect to deportation when he committed the offense, his expectation could not have been anything other than that he was subject to deportation without the opportunity for discretionary relief.

In sum, we conclude that applying § 1229b(d)(1)(B) to Zuluaga's pre-IIRIRA offense would not produce an impermissible retroactive effect, and thus forecloses his eligibility for § 212(c) relief.

**CONCLUSION**

For the foregoing reasons, the petition for review is DENIED.

22

STRAUB, *Circuit Judge*, concurring:

I write separately because I disagree with the majority that retroactive application of the stop-time rule to Zuluaga's case "did not change the consequence of petitioner's criminal act." Nevertheless, because Zuluaga cannot meet this Circuit's requirement that he show actual, detrimental reliance on the prior law in order to demonstrate impermissible retroactive effect (a requirement that, as explained in more detail below, is the subject of considerable controversy and may be ripe for re-examination or review), I must concur in the judgment.

I.

I agree with the majority that Congress has not expressly commanded that the criminal-offense stop-time rule in 8 U.S.C. § 1229b(d)(1)(B) be applied retroactively so that we must address *Langraf* step two. It is at the determination of whether the new stop-time rule attaches adverse legal consequences or new disabilities to past acts where the majority and I part ways.

In concluding that retroactive application of the stop-time rule "did not change the consequence of petitioner's criminal act," the majority reasons: "The instant petitioner committed the offense before meeting the seven-year residency requirement for suspension of deportation, he became eligible for deportation." On this score, the majority is simply wrong as a matter of law. Section 237(a)(2)(B)(i) of the INA, under which Zuluaga was charged with removability, states, in relevant part: "Any alien who at any time after admission *has been convicted* of a violation of . . . any law . . . relating to a controlled substance . . . is deportable." 8 U.S.C. § 1227(a)(2)(B)(i) (emphasis added); *see also Thom v. Ashcroft*, 369 F.3d 158, 170 (2d Cir. 2004) (Underhill, J., dissenting) ("The instant before the jury returns its verdict, the

23

defendant is subject to no immigration consequence; the instant after, he is subject to an immigration consequence."), *cert. denied*, 546 U.S. 828 (2005); *Rankine v. Reno*, 319 F.3d 93, 99 (2d Cir.) ("*Unless and until they were convicted* of their underlying crimes, the petitioners could not be deported." (emphasis added)), *cert. denied*, 540 U.S. 910 (2003); *St. Cyr v. INS*, 229 F.3d 406, 418 (2d Cir. 2000) ("[I]t is the conviction, not the underlying criminal act, that triggers the disqualification from § 212(c) relief." (internal quotation marks omitted)), *aff'd*, 533 U.S. 289 (2001); *accord Atkinson v. Att'y Gen.*, 479 F.3d 222, 231 n.8 (3d Cir. 2007) ("[A]bsent a legal determination of guilt, the alien is not subject to deportation or in need of section 212(c) relief."). Accordingly, at the time Zuluaga *committed* his offense, he was not deportable, as the majority suggests. It was only after his *conviction* that Zuluaga became deportable. And at the time he was convicted, and ultimately placed into removal proceedings, Zuluaga had clearly met the seven-year residency requirement.

Under the prior law, therefore, the timing of the commission of his offense posed no bar whatsoever to Zuluaga's ability to apply for a waiver of deportation, which he could do at any time before a final order of removal was entered, so long as that final order of removal was entered after he had acquired his seven years of residency, which in this case it clearly was. *See Arenas-Yepes v. Gonzales*, 421 F.3d 111, 115 n.4 (2d Cir. 2005) ("Prior to IIRIRA, aliens accrued time toward the continuous physical presence in the United States requirement until they *applied* for suspension of deportation. In short, the commencement of deportation proceedings had no effect on this accrual." (emphasis added) (internal quotation marks omitted)). However, the new stop-time rule, retroactively applied, would prohibit Zuluaga from obtaining relief from

24

removal *from the time he committed the offense*, regardless of when he was convicted, served with an NTA, or ordered removed. Retroactively applying the stop-time rule makes the timing of his offense determinative, and therefore attaches new and adverse legal consequences and new disabilities to past acts. *See INS v. St. Cyr*, 533 U.S. 289, 325 (2001).

The majority hinges its decision on the unlikely hypothetical possibility that Zuluaga could have been convicted, placed into removal proceedings, and ordered removed, all within the one month after he committed the offense and before he acquired his seven years of residency.[1] A far more likely scenario reveals the majority's flawed reasoning. Had Zuluaga been convicted of his April 1995 offense and placed into removal proceedings at any time between May 1995, when he accrued his seven years of residence, and April 1, 1997, the date IIRIRA became effective, Zuluaga unquestionably would have been eligible to apply for suspension of deportation. *See* 8 U.S.C. § 1182(c) (repealed 1996); *Arenas-Yepes*, 421 F.3d at 115 n.4. Accordingly, the delay in "time required to bring an offender to justice" was just as much, if not more, a detriment to Zuluaga's case as it was a benefit.

In any event, resort to hypothetical scenarios is unnecessary here, because the events that actually transpired in Zuluaga's case demonstrate clearly that retroactive application of the stop-time rule imposed "new legal consequences" to Zuluaga's past conduct. *St. Cyr*, 533 U.S. at 321.

---

[1]The majority again errs when it states that Zuluaga "would have been deportable without possibility of discretionary relief had he been convicted before he accrued seven years." In fact, Zuluaga would only have been deportable "without possibility of discretionary relief" had he been convicted, served with an NTA, and ordered removed before he had accrued his seven years residency, which occurred one month after he committed the offense. *See Arenas-Yepes*, 421 F.3d at 115.

At the time Zuluaga was convicted and placed into removal proceedings, he would have been eligible to apply for suspension of deportation under the prior law, because he had clearly met the seven-year residency requirement. When the IJ retroactively applied the new stop-time rule to his pre-IIRIRA conduct, however, Zuluaga was stripped of that eligibility. I fail to see how retroactive application of the new stop-time rule did not impose a "new legal consequence[]" or "new disability," *St. Cyr*, 533 U.S. at 321, to a past act that Zuluaga was "helpless to undo," *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 126 S.Ct. 2422, 2432 (2006). *See also Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994).

I therefore disagree with the majority's view that retroactive application of the stop-time rule "did not change the consequence of petitioner's criminal act." Although IIRIRA did not change the impact of Zuluaga's offense on the initial determination of deportability, it changed the consequence of the *timing* of his criminal act by eliminating the possibility of relief from removal that was previously available to him. *See St. Cyr*, 533 U.S. at 325 ("There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation."). Accordingly, in my view, applying § 1229b(d)(1)(B) to Zuluaga's pre-IIRIRA offense attaches unforeseen, and severe, legal consequences to past conduct that cannot be undone. And since there is no clear indication in IIRIRA that Congress "affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits," *Landgraf*, 511 U.S. at 272–73, the presumption against retroactivity counsels against allowing § 1229b(d)(1)(B) to apply to past conduct. Nevertheless, as explained below, because Zuluaga cannot demonstrate the type of

detrimental reliance required by our precedent, I must concur in the majority's finding that he cannot demonstrate impermissible retroactive effect.

## II.

Our post-*St. Cyr* decisions make clear that, even in cases where a new immigration law attaches new legal consequences to past conduct, in our Circuit, petitioners seeking to show that the new law was impermissibly applied to their case retroactively must show that they detrimentally relied on the prior law.

In *St. Cyr*, the Supreme Court was asked to decide whether the repeal of § 212(c) relief could be retroactively applied to petitioners who had pled guilty to their removable crimes while § 212(c) was still in effect. Although the Court found that the provision could not be retroactively applied, emphasizing that St. Cyr, and many others in his situation, had pled guilty and waived their right to a trial in reliance on the continued availability of § 212(c) relief, the Court stopped short of stating that such reliance must always be shown in order to sustain a finding of impermissible retroactivity. Nevertheless, in *Rankine*, a panel of this Court, reasoning that it could not "ignore the strong signals sent in [the Supreme Court's decision] that aliens who chose to go to trial are in a different position with respect to IIRIRA than aliens like St. Cyr who chose to plead guilty," held that because aliens who were convicted at trial before repeal of § 212(c) could not show that they "detrimentally changed [their] position in reliance on continued eligibility for § 212(c) relief," the new law was not impermissibly retroactive as applied to them. 319 F.3d at 99–100. Reasoning that what such petitioners "truly relied upon was their claim of innocence," the panel found it "difficult to conclude, *as we must to find impermissible*

27

*retroactivity*, that the petitioners chose to go to trial in reliance on the availability of § 212(c) relief." *Id*. at 100–02 (emphasis added). Significantly, after finding that petitioners could not show detrimental reliance on the prior law, the analysis ended. This Court did not go on to examine "whether the new provision attaches new legal consequences to events completed before its enactment," *Landgraf*, 511 U.S. at 269–70, which it most certainly did.[2] Accordingly, in this case, although in my view application of the stop-time rule attaches new legal consequences to Zuluaga's crime, *Rankine* forecloses relief. Under our precedent, in order to successfully argue that the rule is impermissibly retroactive as applied to his case, Zuluaga must show that he detrimentally relied on the prior rule, which, as shown below, he cannot do.

Following *Rankine*, several decisions from this Court have further made clear that we require a showing of actual detrimental reliance. *See*, *e.g.*, *in chron. order*, *Swaby v. Ashcroft*, 357 F.3d 156, 162 (2d Cir. 2004) ("We hold that the decision to go to trial, as a matter of law, forecloses any argument of detrimental reliance on the availability of § 212(c) relief, and that IIRIRA's repeal of § 212(c) is not impermissibly retroactive in its application to petitioner."); *Restrepo v. McElroy*, 369 F.3d 627, 637 (2d Cir. 2004) (finding that petitioners who forwent "filing an affirmative [§ 212(c)] application in the hope of building a stronger record and filing at a later date" could show detrimental reliance under *Rankine*); *Boatswain v. Gonzales*, 414 F.3d 413, 419 (2d Cir.) ("[In *Rankine*], we looked for some indication of a *quid pro quo*, or reasoned

---

[2]Indeed, the "new legal consequences" for the petitioners in *Rankine* were the same as those for St. Cyr. The only difference between the two is that while St. Cyr had pled guilty prior to enactment of the new law, the petitioners in *Rankine* were convicted at trial prior to enactment of the new law.

28

exchange, wherein the individual whose settled expectations were in question relied on a potential benefit in structuring his conduct."), *cert. denied*, 546 U.S. 945 (2005); *Wilson v. Gonzales*, 471 F.3d 111, 122 (2d Cir. 2006) ("The precedential evolution from *St. Cyr*, to *Rankine*, to *Restrepo*, through to *Fernandez-Vargas*, makes clear that the continued availability of § 212(c) relief depends on the reliance of those now seeking the benefit of that relief.");[3] *Walcott v. Chertoff*, 517 F.3d 149, 155 (2d Cir. 2008) ("[W]e hold that § 212(c) relief remains available to an alien ordered removed for a pre-AEDPA conviction that was on appeal when the AEDPA took effect, provided that the alien can prove detrimental reliance of the type recognized in *Restrepo*. . . . [T]he proper inquiry is whether, prior to the AEDPA's passage, an alien reasonably and detrimentally conformed his conduct to the then-prevailing law by making choices intended to preserve or heighten his chances of receiving § 212(c) relief."); *Singh v. Mukasey*, No. 07-1688-ag, — F.3d —, 2008 WL 658239, at *5 (2d Cir. Mar. 14, 2008) (stating that "*Wilson* requires" a "showing of detrimental reliance").[4]

[3]While this passage appears to suggest that the Supreme Court in *Fernandez-Vargas* required a showing of detrimental reliance, as explained in more detail in section III below, I believe such a suggestion is unsupportable.

[4]Contrary to the majority's assertion, I in no way intend to suggest that "reliance is the only factor relevant to retroactivity analysis in immigration cases in this Circuit," or that it is the "sole factor considered in our jurisprudence in immigration cases raising retroactivity concerns." Rather, my view is that under our precedent a showing of reliance is necessary, though not always sufficient, to demonstrate impermissible retroactive effect. Some other factor—for example failure to show retroactive application or effect of the new law—could also doom a petitioner's claim. *See*, *e.g.*, *Fernandez-Vargas*, 126 S. Ct. at 2434 ("Because we conclude that § 241(a)(5) has no retroactive effect when applied to aliens like Fernandez-Vargas, we affirm the judgment of the Court of Appeals."); *Puello v. BCIS*, 511 F.3d 324, 333 (2d Cir. 2007) ("Puello's claim is without merit because the amendments were not applied retroactively to him.").
To the extent the majority argues that our Court does not require a showing of reliance in

29

Moreover, we have further held that, as a general matter, petitioners must show that their reliance was individualized and subjective, not merely objective. *See Wilson*, 471 F.3d at 122. In *Restrepo*, while we found that petitioners who forwent "filing an affirmative [§ 212(c)] application in the hope of building a stronger record and filing at a later date" could show the type of detrimental reliance required by *Rankine*, we left open the question of whether an alien "must make an *individualized* showing that he decided to forgo an opportunity to file for 212(c) relief in reliance on his ability to file at a later date . . . or whether, instead, a *categorical* presumption of reliance by any alien who might have applied for 212(c) relief when it was available, but did not do so, is more appropriate." 369 F.3d at 637–39. In *Wilson*, we answered this question, holding that, as a general matter, the former is required. 471 F.3d at 122.

Here, Zuluaga cannot show the type of individualized, detrimental reliance on pre-IIRIRA law required by *Rankine* and *Wilson*. As the majority correctly states, the operative event in

cases where new legal consequences have attached to past acts, this contention—though appealing for the reasons set forth in section III below—is, in my view, unsupportable. *Domond v. INS*, 244 F.3d 81 (2d Cir. 2001), relied on by the majority, was decided before the Supreme Court decided *St. Cyr*, and, as stated above, our post-*St. Cyr* precedent—relying on the "strong signals" we perceived the Supreme Court to have sent out in *St. Cyr*—has since held that a showing of reliance is required. *Rankine*, 319 F.3d at 99. Indeed, *Rankine* cannot be read in any other manner. *See, e.g., Thom*, 369 F.3d at 163 n.6. Moreover, the manner in which we held that *Domond* remains good law after *St. Cyr* further demonstrates that after *St. Cyr*, reliance is viewed as a requirement in our Circuit. *See Khan v. Ashcroft*, 352 F.3d 521, 523 (2d Cir. 2003) ("[W]hereas in *St. Cyr*[], the alien's plea of guilty prior to the passage of AEDPA § 440(d) could have been entered in reliance on the possibility of being granted a § 212(c) discretionary waiver of deportation, in *Domond* we noted that, in contrast, 'it cannot reasonably be argued that aliens committed crimes in reliance on' such a possibility." (quoting *Domond*, 244 F.3d at 86)). Finally, the majority does not, and in my view cannot, square the contention that reliance is not required with the reasoning and holding of *Rankine* and its progeny (as set forth above), nor does it address decisions from other circuits (as set forth below), which have explicitly recognized our controversial reliance requirement.

Zuluaga's case is his commission of the crime. However, any argument that Zuluaga committed the crime in reliance on his future eligibility for suspension of deportation under pre-IIRIRA law is foreclosed by our precedent. In *Domond*, relying on our decision in *St. Cyr*, we stated that "it would border on the absurd to argue that [the petitioner] would have decided not to commit a crime if he had known that he . . . could face deportation without the availability of a discretionary waiver of deportation." 244 F.3d at 86 (alterations and internal quotation marks omitted); *see also Khan*, 352 F.3d at 524–25 (holding that *Domond* remains good law after the Supreme Court's *St. Cyr* decision and explicitly citing *Domond* with approval on this point).[5] Accordingly, Zuluaga cannot show that application of the stop-time rule to his case was impermissible under our precedent.[6]

---

[5]While we have rejected this argument as "border[ing] on the absurd," I note that whether it should be rejected at all is subject to dispute. *See*, *e.g.*, *Thom*, 369 F.3d at 168 n.2 (Underhill, J., dissenting) ("I note that this oft-quoted passage is one that conflicts with my 'sound instincts' as a judge. If it is, indeed, absurd to suggest that a person contemplating the commission of a crime considers the potential consequences of criminal conduct, then Congress and the Sentencing Commission surely are misguided in their attempts to deter crime through increased sentences. I respectfully suggest that it is far from absurd to believe the prospect of certain deportation, rather than possible deportation, might well deter a significant number of aliens from committing aggravated felonies." (citing *Landgraf*, 511 U.S. at 270)); *Restrepo*, 369 F.3d at 632 n.8 ("We . . . note that, in the context of criminal sanctions, similar retroactive increases in penalties have been considered to raise serious concerns under the Ex Post Facto Clause, presumably because they violate notice rather than reliance interests." (internal citation omitted)); *Beharry v. Reno*, 183 F. Supp. 2d 584, 590 (E.D.N.Y. 2002) (Weinstein, J.) ("The court of appeals' argument in *Domond* . . . might be viewed by some as missing the mark."), *rev'd on jurisdictional grounds*, 329 F.3d 51 (2d Cir. 2003); *see also St. Cyr*, 229 F.3d at 419 ("[L]awful permanent residents are typically part of a resident alien community and are likely aware of what happens to other members of the community who engage in criminal conduct.").

[6]Zuluaga argues that "[h]ad he been aware at the time he entered his guilty plea that his eligibility for relief from removal would be pretermitted, he would have considered foregoing the plea." Even if we were to view the conviction as the operative event for determining whether

## III.

The requirement that petitioners arguing impermissible retroactivity show individualized, detrimental reliance on the prior law is the subject of a considerable amount of controversy among, within, and surrounding the courts of appeals.

As various courts have noted, the requirement has not been imposed by, and in fact appears to run afoul of, Supreme Court retroactivity case law. In *Landgraf*, the Supreme Court was asked to decide whether provisions of the Civil Rights Act of 1991 permitting a plaintiff to recover damages for unlawful discrimination could be retroactively applied to the actions of Barbara Landgraf's employer. The Court found that "the new compensatory damages provision would operate 'retrospectively' if it were applied to conduct occurring before [enactment of the 1991 Act]" because it would "attach an important new legal burden to that conduct." 511 U.S. at 282–83. As the Third Circuit later observed, "[i]n determining that the amendment did not apply to pending cases, the Court did not base its decision on the specific conduct of Landgraf's employer or on any reliance that either Landgraf or her employer may have had on the state of the law when discriminatory conduct occurred." *Atkinson*, 479 F.3d at 228. "Instead, the Court made a general analysis of the impact of the amendment, finding retroactivity improper because the amendment instituted a legal change that attached a new legal burden to the proscribed conduct."

settled expectations were upset, however, such an argument is foreclosed by our precedent. *See Domond*, 244 F.3d at 86 (holding that aliens who entered guilty pleas after the new law went into effect could not establish impermissible retroactivity); *Khan*, 352 F.3d at 524 ("*St. Cyr II*, like *Domond*, evaluated aliens' expectations in light of 'the time of their plea *under the law then in effect*.'") (citing *St. Cyr*, 533 U.S. at 326) (emphasis added). Zuluaga and amicus advance no other reliance arguments. Accordingly, I take no view as to whether Zuluaga might have some other colorable reliance claim under *Restrepo*, *Wilson*, or their progeny.

32

*Id*.; *see also Hem v. Maurer*, 458 F.3d 1185, 1192 (10th Cir. 2006) ("The facts of *Landgraf* itself belie any notion that the Supreme Court requires a showing of actual reliance as a prerequisite to sustain a retroactivity challenge."). The *Landgraf* Court accordingly affirmed that "'every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective.'" 511 U.S. at 269 (quoting *Society for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.N.H.1814) (No. 13,156) (Story, J.)).

Similarly, in *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997), the Supreme Court held that a 1986 amendment to the False Claims Act (FCA), which eliminated certain defenses to suits under the FCA, could not be retroactively applied to suits based on pre-enactment conduct. *Id*. at 947–48. "There [was], however, no consideration in *Hughes* of whether Hughes Aircraft, in particular, or any defendant, in general, in an FCA action might have relied on the former law in conducting business with the government." *Atkinson*, 479 F.3d at 229. "It was the new legal burden imposed on events past, rather than the reliance on the former law by the person affected, which was the basis for holding that the 1986 amendment would not be applied retroactively." *Id*.; *see also Hem*, 458 F.3d at 1193 ("*Hughes Aircraft* . . . similarly failed to impose any reliance requirement on retroactivity challenges."); *Olatunji v. Ashcroft*, 387 F.3d 383, 391 (4th Cir. 2004) (explaining that *Hughes Aircraft* confirms that "*Landgraf* did not intend to impose a requirement of reliance" because there the Court held that "elimination of certain defenses to *qui tam* suits under the False Claims Act could not be applied

33

retroactively to Hughes Aircraft . . . *without even a single word of discussion as to whether Hughes Aircraft—or, for that matter, similarly situated government contractors—had relied on the eliminated defense to its detriment*"). Moreover, the *Hughes Aircraft* Court stated that *Landgraf*'s description was not "the exclusive definition of presumptively impermissible retroactive legislation," and thus, each of the identified effects is "a *sufficient*, rather than a *necessary*, condition for invoking the presumption against retroactivity." 520 U.S. at 947.

Recent Supreme Court cases in the immigration context do not cast doubt on this interpretation. In *St. Cyr*, as stated above, the Supreme Court admittedly considered the fact that aliens had relied on the availability of § 212(c) relief in deciding to plead guilty; however, the Court stopped short of stating that such reliance was required for a finding of impermissible retroactivity. *See Olatunji*, 387 F.3d at 393 (stating that "*St. Cyr* did not purport to add a subjective reliance requirement," but rather that the Court in *St. Cyr* emphasized petitioner's reliance because it indicated "'an *obvious and severe* retroactive effect.'" (citing *St. Cyr*, 533 U.S. at 325)). And, in *Fernandez-Vargas*, the Supreme Court held that an IIRIRA provision for the reinstatement of removal orders against aliens illegally reentering could be permissibly applied to aliens who reentered the United States before IIRIRA became effective. 126 S. Ct. at 2434. However, the Court based its holding not on reliance grounds, but on the finding that the new law does not impose new legal consequences on past conduct that could not be undone. The Court reasoned, "[i]t is . . . the alien's choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subjects him to the new and less generous legal regime, not a past act that he is helpless to undo." *Id.* at 2432; *see also Hem*, 458 F.3d at 1198–99

34

("The problem with Fernandez-Vargas' *Landgraf* argument, the majority reasoned, was that § 241(a)(5) did not affect his *past* conduct."). As the Tenth Circuit observed, "[c]onsistent with . . . the *Landgraf* cases, the [*Fernandez-Vargas*] Court never converts 'detrimental reliance' on prior law into a prerequisite for sustaining a retroactivity claim. Rather, the retroactivity inquiry remains the two part inquiry established in *Landgraf*, together with a strong presumption against retroactive application, with no discussion of reliance even appearing until the Court summarizes the pertinent facts of St. Cyr." *Hem*, 458 F.3d at 1198–99 (citing *Fernandez-Vargas*, 126 S. Ct. at 2428); *see also United States v. De Horta Garcia*, No. 07-2060, — F.3d —, 2008 WL 656909, at *6 (7th Cir. Mar. 13, 2008) (Rovner, J., concurring) ("[T]here are indeed references to reliance in the Supreme Court's retroactivity precedents. That is not surprising, for reliance always looms in the background as a reason explaining the Court's longstanding presumption that when Congress enacts a new law, it does not intend for the law to apply retroactively unless it makes that intent clear. . . . But no Supreme Court decision requires or turns on proof that the party contesting retroactive application of new legislation actually relied to his detriment on prior law in setting his own course of conduct." (internal citations omitted)).

While some courts of appeals have found the Supreme Court doctrine to be clear on this matter, other courts have disagreed as to whether detrimental reliance should be a requirement at all, and if so, whether subjective, individualized reliance must be shown as opposed to merely objective reliance. The Third and Fourth Circuits, for example, have stated that no showing of reliance is required. *See, e.g.*, *Atkinson*, 479 F.3d 231 ("[W]e conclude that reliance is but one consideration in assessing whether a statute attaches new legal consequences to past events.");

35

*Olatunji*, 387 F.3d at 388 ("[W]e hold that reliance (whether subjective or objective) is not a requirement of impermissible retroactivity . . . .").

In rejecting a reliance requirement, the Fourth Circuit in *Olatunji* focused on the presumption against retroactivity set forth in *Landgraf*, reasoning, "we do not believe that subjective reliance is, or ought to be, relevant to the question of whether a particular statute is impermissibly retroactive, as such is neither dictated by Supreme Court precedent nor related to the presumption of congressional intent underlying the bar against retroactivity." 387 F.3d at 389. The court further reasoned:

> Whether the particular petitioner did or did not subjectively rely upon the prior statute or scheme has nothing whatever to do with Congress' intent—the very basis for the presumption against statutory retroactivity. It is one thing to indulge in the supportable presumption that Congress intends its enactments not to operate retroactively; it is another altogether to indulge the quite different, and unsupported and unsupportable, presumption that Congress so intends, but only where the particular petitioning party can prove that he subjectively relied on the prior statute to his detriment. In other words, where Congress has apparently given no thought to the question of retroactivity whatever, there is no basis for inferring that Congress' intent was any more nuanced than that statutes should not be held to apply retroactively. Anything more, in the face of complete congressional silence, is nothing but judicial legislation.

*Id*. at 394. Accordingly, relying on case law from the Third Circuit, the court concluded, "[w]hether a plaintiff did or did not rely on a prior statutory scheme is irrelevant to whether that scheme in fact has a retroactive effect on that plaintiff. 'It is,' as the Third Circuit has noted, 'a strange "presumption" . . . that arises only on so heightened a showing as actual reliance.'" *Id*. at 391 (quoting *Ponnapula v. Ashcroft*, 373 F.3d 480, 491 (3d Cir. 2004)). Similarly, the Third Circuit in *Atkinson* relied on Supreme Court precedent and the presumption against retroactivity in concluding that no showing of reliance is required. *See* 479 F.3d at 231.

36

The Sixth, Ninth, and Tenth Circuits, in contrast, have stated that a showing of reliance is required, but these circuits only require a showing of objectively reasonable reliance. *See*, *e.g.*, *Thaqi v. Jenifer*, 377 F.3d 500, 504 n.2 (6th Cir. 2004) ("We note that, under *St. Cyr*, the petitioner need not demonstrate actual reliance upon the immigration laws in order to demonstrate an impermissible retroactive effect; he need only be among a class of aliens whose guilty pleas 'were likely facilitated' by their continued eligibility for § 212(c) relief."); *Camins v. Gonzales*, 500 F.3d 872, 884 (9th Cir. 2007) ("In determining whether the attachment of new legal consequences to past actions conflicts with familiar considerations of fair notice, reasonable reliance, and settled expectations, we require that reliance on the prior law would have been objectively reasonable under the party's circumstances." (citations and internal quotation marks omitted)); *Hem*, 458 F.3d at 1187 ("[W]e conclude that an objective showing of reliance is the appropriate rule.").

The Tenth Circuit's decision in *Hem* extensively sets forth the reasoning for requiring a petitioner to show objective reliance—as opposed to the individualized or actual detrimental reliance required in this Circuit. *Compare* 458 F.3d at 1197, *with Wilson*, 471 F.3d at 122. As set forth above, and similar to the Third and Fourth Circuits, the court in *Hem* reasoned that the Supreme Court has never required a showing of actual reliance. *See Hem*, 458 F.3d at 1197 ("[I]n none of the recent retroactivity cases . . . did the Supreme Court confer dispositive weight upon the petitioner's actual strategic decisions. And, although *St. Cyr* gives reliance a central role in its retroactivity analysis, the Court there conspicuously applies its holding to all petitioners who took guilty pleas before the effective date of IIRIRA—irrespective of any showing that St. Cyr

37

himself actually relied on the availability of § 212(c) relief."). Further, relying on reasoning set forth by the Third Circuit in *Ponnapula*, 373 F.3d at 489–90, the court in *Hem* explicitly rejected our reasoning in *Rankine*, as follows:

> First, with the exception of a single passing reference to another case, *Rankine* never once mentions the presumption against retroactivity. As the Court made clear in *Landgraf* and its progeny, however, this presumption informs every step of the *Landgraf* inquiry. Second, the particular strategic decisions of the individual petitioners are given dispositive weight in the retroactivity analysis, not whether they, as a class, faced new legal consequences to their completed conduct. Finally, *Rankine* appears to turn the presumption against retroactivity on its head by demanding that petitioners point to conduct on their part that reflects an intention to preserve their eligibility for relief under § 212(c) by going to trial.

458 F.3d at 1196 (alterations, citations, and internal quotation marks omitted). Accordingly, the court in *Hem* "confident[ly]" followed "the objective reliance approach to retroactivity . . . in determining whether the repeal of § 212(c) has retroactive effects." *Id*. at 1199.

On the other side of this split, along with our Circuit, the First, Fifth, and Seventh Circuits require that petitioners show individualized, subjective detrimental reliance. *See*, *e.g.*, *Dias v. INS*, 311 F.3d 456, 458 (1st Cir. 2002) (holding that IIRIRA's repeal of § 212(c) was not impermissibly retroactive to petitioners who did not rely on pre-IIRIRA law because the "retroactivity analysis must include an examination of reliance") (citing *Mattis v. Reno*, 212 F.3d 31, 38 (1st Cir. 2000) (A petitioner must have "actually and reasonably relied" on the availability of relief for IIRIRA's repeal of § 212(c) to have retroactive effect.), *abrogated on other grounds by St. Cyr*, 533 U.S. at 325–26), *cert. denied*, 539 U.S. 926 (2003); *Carranza-De Salinas v. Gonzales*, 477 F.3d 200, 205 (5th Cir. 2007) ("[T]his circuit requires an applicant who alleges continued eligibility for § 212(c) relief to demonstrate actual, subjective reliance on the

pre-IIRIRA state of the law to be eligible for relief from its retroactive application."); *De Horta Garcia*, 2008 WL 656909, at \*3 ("[W]e require[] a showing of specific facts demonstrating actual reliance."); *see also Brooks v. Ashcroft*, 283 F.3d 1268, 1274 (11th Cir. 2002) (finding meritless petitioner's Equal Protection claim, because, unlike aliens who plead guilty prior to the enactment of IIRIRA, petitioner, who was convicted at trial, "did not so choose to rely upon the agreed upon terms of a plea" and because his case did not present "the same concerns of *quid pro quo*, benefit for an exchange, between a defendant and the government").

Even within these Circuits, however, individual judges have expressed disagreement with the actual reliance requirement. For example, in *Thom*, Judge Calabresi noted that were he "judging on a clean slate, [he] would read the Supreme Court's seminal decision on civil retroactivity, *Landgraf*[]—at a minimum—to say that, where Congress has not made its intent clear, courts should presume that any civil statute that would be considered *ex post facto* in the criminal context was meant to apply prospectively only." 369 F.3d at 163 n.6. Judge Calabresi explained that "[t]his reading would be particularly appropriate in cases where, as here, the civil law in question imposes consequences very like those of criminal penalties," and that he "would expect that the Supreme Court's future decisions in this field will confirm such readings of *Landgraf*." *Id*. Likewise, in his dissenting opinion in *Thom*, Judge Underhill argued that "[a]lthough there is no denying that considerations of reliance are often illuminating in making retroactivity determinations (indeed, the *presence* of reliance may very well provide the most compelling indication of unfair retroactivity), 'detrimental reliance' is not the *sine qua non* of retroactivity analysis. . . . The existence of reliance supported the holding in *St. Cyr*, but the

39

holding in *St. Cyr* does not require the existence of reliance." *Id*. at 167–73. Similarly, in a concurring opinion in *De Horta Garcia*, 2008 WL 656909, at *6, Judge Rovner of the Seventh Circuit stated, "the Fourth Circuit's opinion in *Olatunji* . . . makes a compelling case for the proposition that reliance is not properly an element of the retroactivity inquiry." Judge Rovner further opined that "[t]o the extent that reliance ought to play any role in the retroactivity analysis, it is objective rather than subjective reliance that should be considered," and she concluded that "the precedents that stand in De Horta Garcia's path may be incorrect and should be re-visited." *Id*. at *7–8. District judges within our Circuit have also expressed their disagreement with the reliance requirement. *See, e.g.*, *Beharry*, 183 F. Supp. 2d at 591 (Weinstein, J.) ("*Domond* . . . should be reconsidered as the courts interpret and develop the Supreme Court's more recent immigration rulings and the requirements of international law."); *Mohammed v. Reno*, 205 F. Supp. 2d 39, 47 (E.D.N.Y.) (Gleeson, J.) ("Implicit in [*Domond*'s] conclusion is the premise that an impermissible retroactive effect under *Landgraf* occurs only where a person has knowledge of the law at the time of his actions and actually relies on it. *Landgraf* simply does not support—indeed, it would undermine—that rationale."), *stay pending appeal vacated*, 309 F.3d 95, 103 (2d Cir. 2002) (recognizing "the possibility that the Supreme Court might interpret its *St. Cyr* opinion more expansively than we have").

## IV.

As the above illustrates, whether—and to what extent—a showing of reliance on the prior law is required to demonstrate impermissible retroactive effect of a new law is the subject of much debate and, perhaps, "should be re-visited" or reviewed. *See De Horta Garcia*, 2008 WL

40

656909, at *8 (Rovner, J., concurring). Nevertheless, for the moment, an individualized showing of actual reliance is required in our Circuit, and this, Zuluaga is unable to demonstrate.

Accordingly, while I disagree with the majority that application of the stop-time rule imposes no new legal consequences on Zuluaga's past conduct, I must concur in the judgment.